Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NARESH RAMMOHAN, derivatively on behalf of WRAP TECHNOLOGIES, INC. | Case No.: |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| MARC THOMAS, THOMAS P. SMITH, JAMES A. BARNES, MICHAEL ROTHANS, SCOT J. COHEN, PATRICK KINSELLA, DAVID NORRIS, MICHAEL PARRIS, and WAYNE R. WALKER, | |
| Defendants, | |
| and | |
| WRAP TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

**INTRODUCTION**

Plaintiff Naresh Rammohan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Wrap Technologies, Inc. ("Wrap" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Marc Thomas ("Thomas"), Thomas P. Smith ("Smith"), James A. Barnes ("Barnes"), Michael Rothans ("Rothans"), Scot J. Cohen ("Cohen"), Patrick Kinsella ("Kinsella"), David Norris ("Norris"), Michael Parris ("Parris"), and Wayne R. Walker ("Walker") (collectively, the "Individual Defendants," and together with Wrap, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Wrap, unjust enrichment, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wrap, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Wrap's directors and officers from April 29, 2020 through September 23, 2020, both dates inclusive (the "Relevant Period").

2.      Founded in March 2016 and incorporated in Delaware in March 2017, Wrap is an Arizona-based security technology company. Wrap touts itself as focused on delivering "modern policing solutions" to its customers, which primarily consist of law enforcement and security personnel. The Company's flagship product offering is the BolaWrap—a hand-held remote restraint device that discharges an eight-foot bola style Kevlar tether at approximately 513 feet per second to entangle a subject at a range of 10-25 feet. Wrap markets the product as "remote handcuffs" that "safely" and "humanely" restrain resisting subjects from a distance "without relying on pain compliance tools."

3.      Defendants Barnes, and Cohen, together with Elwood G. "Woody" Norris ("E. Norris"), the Company's Chief Technology Officer ("CTO"), co-founded the Company on March 2, 2016. Initially, the Company was organized as a Delaware limited liability company with its headquarters and its main manufacturing facility both located in Las Vegas, Nevada. By the end of that year, in December 2016, the Company demonstrated Wrap's first prototype of the BolaWrap device.

4.      After developing and improving upon the BolaWrap design the Company relocated its manufacturing operations to Tempe, Arizona in September 2019 to increase manufacturing capacity.

5.      On December 3, 2019, the Los Angeles Police Department (the "LAPD")[1] announced that it would train its officers on the BolaWrap and deploy 200 devices in the field for a 90-day pilot program (the "LAPD BolaWrap Pilot Program"). Deputy Chief Martin Baeza, Head of the Personnel and Training Bureau of the LAPD, stated that the temporary pilot program was for the purposes of determining if the BolaWrap would meet the LAPD's "needs and standards."

---

[1] With approximately 9,870 active officers and nearly 3,000 administrative and executive staff, the LAPD is the third-largest local law enforcement agency in the United States. The LAPD's operating budget is approximately $1.86 billion. https://www.worldatlas.com/articles/the-largest-police-departments-in-the-us.html. Last visited October 16, 2020.

6.      On February 5, 2020, the Los Angeles Board of Police Commissioners ("LAPD Board of Commissioners") authorized the start of the LAPD BolaWrap Pilot Program. Although the LAPD BolaWrap Pilot Program was initially meant to only last 90 days, the LAPD Board of Commissioners authorized the extension of the initial term of the LAPD BolaWrap Pilot Program to 180 days.

7.      Also on April 29, 2020, the Company issued a press release in connection to Wrap's first fiscal quarter 2020 financial results that highlighted the LAPD BolaWrap Pilot Program. That same day, during an earnings call in connection to the Company's first fiscal quarter 2020 financial results, Defendants Smith and Rothans attributed the limited use of the BolaWrap to temporary circumstances.

8.      However, the truth regarding the BolaWrap's practical effectiveness and the Company's business prospects slowly began to emerge on July 22, 2020, when *Seeking Alpha* published a research report by *White Diamond Research* ("First White Diamond Report") that asserted that the BolaWrap is an "impractical device" with a very limited market.

9.      On this news, the price of the Company's stock dropped from $11.89 per share at the close of trading on July 21, 2020, to an intra-day low of $10.62 per share, representing a drop of nearly 10.7%, before settling at $11.34 per share at the close of trading on July 22, 2020, a drop of more than 4.6%, on heavy trading volume.

10.      Meanwhile, the Company's misleading disclosures continued. On July 30, 2020, during an earnings call in connection to the Wrap's financial results for the second fiscal quarter ended June 30, 2020, Defendant Norris gave the impression that the BolaWrap devices were being used all of the time by the LAPD throughout the duration of the LAPD BolaWrap Pilot Program.

11.      However, on after the market closed on August 25, 2020, the *Los Angeles Times* published an article that reported that the LAPD Board of Commissioners reviewed and approved the LAPD Chief of Police's request to extend the LAPD BolaWrap Pilot

Program for an additional 180 days to continue evaluating the device and detailed certain limited instances that the BolaWrap had been used.

12.     On this news, the price of the Company's stock dropped from $8.77 per share at the close of trading on August 25, 2020, to $8.27 per share at the close of trading on August 27, 2020, a drop of more than 5.7%, on heavy trading volume over the two trading days.

13.     Throughout the Relevant Period, the Individual Defendants caused the Company to consistently make statements touting the LAPD's "great" and "positive" feedback on the LAPD BolaWrap Pilot Program and characterized the LAPD's extension of the program as a "very good thing," and represented that "[i]f [the] LAPD didn't like the product, they wouldn't be asking for extensions." In reality, however, after the first six months, the LAPD's officers had hardly used the BolaWrap in the field and merely extended the LAPD BolaWrap Pilot Program to "continue to evaluate the BolaWrap for effectiveness."

14.     The full truth was revealed to the public on September 23, 2020, when *Seeking Alpha* published a research report by *White Diamond Research* (the "Second White Diamond Report") announcing that the Company had been concealing an LAPD report that contained "disastrous" news on the LAPD BolaWrap Pilot Program. Specifically, for example, the Second White Diamond Report revealed, among other things, that "[o]ver a six-month period, 200 BolaWrap devices in the hands of 1,100 LAPD officers in the field were only used nine times, and only worked once." The Second White Diamond Research Report further stated, "[a]t least 191 BolaWraps weren't used at all in the pilot program, they were just sitting there collecting dust" and concluded that "this was about the worst result that could've happened from the program."

15.     On this news, the price of the Company's stock dropped from $8.14 per share at the close of trading on September 22, 2020, to an intra-day low of $5.68 per share, representing a drop of more than 30.2%, before settling at $6.07 per share at the close of

trading on September 23, 2020, a drop of approximately 25.43%, on uncommonly heavy trading volume.

16.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Wrap's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the BolaWrap could only be deployed under a particularly narrow set of logistical circumstances due to its design; (2) consequently, it was not likely that the BolaWrap would be operational and/or consistently deployed successfully in the field; (3) Wrap had suppressed the results of the LAPD BolaWrap Pilot Program, which revealed that the BolaWrap was largely ineffective, too costly, hardly employed by officers in the field, and that the LAPD merely extended the program due to an insufficient sample size of BolaWrap deployments to properly evaluate the effectiveness of the device; (4) as a result of the LAPD's findings, the LAPD and/or other comparable police departments were unlikely to agree to purchase a significant amount of BolaWrap units and therefore it was doubtful that Wrap would derive substantial revenue from the LAPD and/or other comparable police departments; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, Wrap's public statements were materially false and misleading at all relevant times.

17.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19.     Furthermore, during the Relevant Period, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining proceeds of over $258,588.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company, its former Chief Executive Officer ("CEO"), its President, and its Chief Financial Officer ("CFO") to being named as defendants in three federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (with its CEO and Chief Operating Officer ("COO") also being named as defendants in one of them) (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the former and current CEO's, the President's, the COO's, and the CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Wrap's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

Verified Shareholder Derivative Complaint

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

23.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

24.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

28.    Venue is proper in this District because Wrap and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.    Plaintiff is a current shareholder of Wrap common stock. Plaintiff has continuously held Wrap common stock at all relevant times.

### Nominal Defendant Wrap

Verified Shareholder Derivative Complaint

30.     Wrap is a Delaware corporation with its principal executive offices located at 1817 W. 4th Street, Tempe, Arizona 85281. Wrap's shares trade on NASDAQ Global Select Market under the ticker symbol "WRTC."

**Defendant Thomas**

31.     Defendant Thomas has served as the Company's Chief Government Affairs Officer ("CGAO") since October 29, 2020. Previously, he served as the Company's CEO from July 30, 2020 until October 27, 2020. According to the current report filed on October 30, 2020 with the SEC on Form 8-K, Defendant Thomas is entitled to receive an annual base salary of $400,000 as compensation for his services as the CGAO. Further, Defendant Thomas is eligible to receive an additional cash bonus following each calendar year of his employment. According to the current report filed on July 31, 2020 with the SEC on Form 8-K, Defendant Thomas was entitled to receive an annual base salary of $400,000 as compensation for his services as the CEO.

32.     The Company's website stated the following about Defendant Thomas:[2]

**Marc Thomas** Marc Thomas is a former Chairman, President & CEO of GE Aviation Materials, LP and has held numerous senior leadership and board positions within GE and other business entities. With over twenty-five years of crisis management, operations and manufacturing experience in supply chain, consumer products, mergers & acquisitions, and transportation, Marc has primarily served as a turnarounds / growth leader. While at GE, he was instrumental in generating almost $500 million in revenues / savings and won the coveted GE Latimer Award for Leadership and Lean Six Sigma Excellence. Prior to joining GE, Marc was a consultant with McKinsey & Company's Houston office focusing on the energy, consumer products, and telecommunication industries. Additionally, he spent over 10 years in the U.S. Army serving initially as a Special Forces Operational Detachment ("A" Team) Commander in Africa and the Middle East, and finally as an Assistant Professor of Engineering Management, Department of Systems Engineering at the United States Military Academy, West Point, NY where he functioned as both course director and leader of the Department's "Hot Brief" Team created to provide visiting members of Congress and other dignitaries with

---

[2] https://wraptechnologies.com/investors/. Last visited October 9, 2020.

relevant                information            on            the            Academy.

In 1994, Marc was appointed by President Bill Clinton (D-AR) as a White House Fellow and subsequently chosen by Vice President Al Gore (D-TN) as Special Advisor for National Security Affairs. While in the White House, Marc's portfolio included but was not limited to the Global Environment, U.N. Peace Keeping, Counter-Terrorism, Refugee Affairs, and International Business Development. Serving as Executive Director of the U.S. – South Africa Bi-National Committee, Marc was instrumental in facilitating the work of inter-government agencies, domestic and international development organizations to strengthen South Africa's economy. After the White House, Marc was selected as a Legislative Assistant to Senator Dirk Kempthorne (R-ID) with emphasis on the National Environment, U.S. Armed Services, Public Works, and Domestic Policy matters.

Marc recently sold his interest in Thorium Capital Ventures & Consulting, LLC where he served as President & CEO advising / managing portfolio companies particular in the manufacturing and service industries. He holds a BS in Civil / Environmental Engineering from Stanford University, MS in Industrial Engineering / Operations Research from Columbia University, MBA in Finance / Management Consulting from Columbia University, and JD in Corporate / Intellectual Property Law from the University of Texas at Austin. Marc possesses years of experience in identifying risks, building dynamic teams, preparing contingency and recovery plans, and managing resources during crises.

**Defendant Smith**

33.    Defendant Smith has served as the Company's President since March 2019 and as the Company's Interim CEO since October 27, 2020. Previously, he served as a consultant to the Company. According to the Company's Schedule 14A filed with the SEC on April 20, 2020 (the "2020 Proxy Statement"), as of April 9, 2020, Defendant Smith beneficially owned 388,889 shares of the Company's common stock, which represented 1.3% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Smith owned nearly $1.7 million worth of Wrap stock.

34.     For the fiscal year ended December 31, 2019, Defendant Smith received $2,268,421 in compensation from the Company. This included $197,917 in salary, $2,060,088 in option awards, and $10,416 in all other compensation.

35.     The Company's 2020 Proxy Statement stated the following about Defendant Smith:

> **Thomas P. Smith** joined the Company in March 2019 as President. Mr. Smith co-founded TASER International (now Axon Enterprise, Inc.) ("*TASER*") in 1993. He served as President of TASER until October 2006, and as Chairman of the Board of Directors of TASER from October 2006 until he retired to pursue entrepreneurial activities in February 2012. Amongst his most significant roles and responsibilities at TASER, Mr. Smith managed domestic and international export sales, significantly expanding the sale and distribution of TASER's products, including sales to more than 17,200 federal, state and local law enforcement agencies in over 100 countries. In 2012 he co-founded Achilles Technology Solutions, LLC ("*Achilles*"), and through its wholly-owned subsidiary ATS Armor, LLC ("*ATS Armor*"), which he co-founded in 2015, developed products for law enforcement and military. Mr. Smith served as the Managing Member of Achilles from 2012 to January 2020. In addition, Mr. Smith served as the Managing Member of ATS Armor and ATS MER ("*ATS MER*"), a research and development company acquired by Achilles in 2015 that was primarily funded by government SBIR contracts, until March 2019 and February 2019, respectively. ATS Armor filed a petition for Chapter 7 Bankruptcy in March 2019, and ATS MER filed a petition for Chapter 7 Bankruptcy in February 2019. Mr. Smith holds a B.S. degree in Ecology and Evolutionary Biology from the University of Arizona and a M.B.A. degree from Northern Arizona University.

## **Defendant Barnes**

36.     Defendant Barnes co-founded the Company and has served as the Company's CFO since March 2017, and as the Company's Secretary and Treasurer since January 2018. He also served as President of the Company from March 2017 until January 4, 2018 and a Company director from March 2017 until November 14, 2018. Previously, he served as a Manager from March 2016 until the Company's incorporation in March 2017. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Barnes beneficially owned 2,401,394 shares of the Company's common stock, which represented 7.9% of the

Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Barnes owned nearly $10.5 million worth of Wrap stock.

37.    For the fiscal year ended December 31, 2019, Defendant Barnes received $303,666 in compensation from the Company, which consisted of $180,000 in salary and $123,666 in stock awards. For the fiscal year ended December 31, 2018, Defendant Barnes received $194,056 in compensation from the Company, which consisted of $120,000 in salary and $74,056 in option awards.

38.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Barnes made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|-----------|--------|---------|----------|
| 6/11/2020 | 6,000  | $6.73   | $40,380  |
| 7/1/2020  | 6,000  | $10.50  | $63,000  |
| 8/3/2020  | 6,000  | $10.04  | $60,240  |
| 9/1/2020  | 6,000  | $8.94   | $53,640  |

Thus, in total, before the fraud was exposed, he sold 24,000 Company shares on inside information for which he received nearly $217,260. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

39.    The Company's 2020 Proxy Statement stated the following about Defendant Barnes:

**James A. Barnes** cofounded the Company with Mr. Elwood Norris and Mr. Cohen in March 2016, and currently serves as Chief Financial Officer, Secretary and Treasurer. He served as Manager until the Company's incorporation in March 2017 when he was appointed President and Chief Financial Officer. He served as a member of the Company's Board of Directors from March 2017 to November 2018. In January 2018 he was appointed to the additional positions of Secretary and Treasurer and resigned as President. He has served as the President of Sunrise Capital, Inc., a private

venture capital and financial and regulatory consulting firm, since 1984. He was Chief Financial Officer of Parametric Sound Corporation (now Turtle Beach Corporation) from 2010 to February 2015, and from February 2015 to February 2017 served as Vice President Administration at Turtle Beach Corporation. Since 1999, he has been Manager of Syzygy Licensing LLC ("*SYZYGY*"), a private technology invention and licensing company he owns with Mr. Elwood Norris. He previously practiced as a certified public accountant and management consultant with Ernst & Ernst, Touche Ross & Co., and as a principal in J. McDonald & Co. Ltd., Phoenix, Arizona. He graduated from the University of Nebraska with a Bachelor of Arts Degree in Business Administration in 1976 and is a certified public accountant (status: inactive).

### Defendant Rothans

40.     Defendant Rothans has served as the Company's COO since November 2018. Previously, he served as the Company's Senior Vice President of Business Development from September 2017 until November 2018. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Rothans beneficially owned 117,971 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Rothans owned nearly $514,354 worth of Wrap stock.

41.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rothans made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 6/3/2020 | 4,800 | $8.61 | $41,328 |

Thus, in total, before the fraud was exposed, he sold 4,800 Company shares on inside information for which he received $41,328. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Rothans:

*Michael Rothans* joined the Company in September 2017 as Senior Vice President of Business Development, a position that he held until November 2018, at which point he was appointed as the Company's Chief Operating Officer. As Senior Vice President of Business Development, he was responsible for engaging larger police agencies across the United States. Prior to joining the Company, Mr. Rothans served as a police officer and executive in the Los Angeles County Sheriff's Department for thirty-one years, where he retired as the Assistant Sheriff overseeing the department's patrol operations in 2015. While there, he worked in all aspects of law enforcement, including custody, patrol, investigative, administrative, supervisory and management roles. In addition, he was responsible for a nearly one-billion-dollar budget and supervised over 6,000 sworn and civilian personnel. Mr. Rothans received many commendations during his career, including the Los Angeles County Sheriff's Department Distinguished Service Award in 1997 and 2010, the Exemplary Service Award in 2001, 2005, and 2009, and, the Meritorious Service Award in 2008. In addition, as Chair of the Executive Force Review Committee responsible for reviewing all Officer Involved Shootings and significant uses of force, he developed invaluable knowledge about real world encounters between police and the public. Mr. Rothans graduated from Loyola Marymount University in 1984 with a Bachelor of Arts Degree in Political Science, immediately after which he joined the police academy.

**Defendant Cohen**

43.    Defendant Cohen co-founded the Company and has served as the Company's Executive Chair since July 2017. Previously, he served as the Company's Secretary until January 2018 and as a Manager from March 2016 until the Company's incorporation in March 2017. Additionally, Defendant Cohen founded, owns, controls, and serves as the Managing Partner of V3 Capital Partners, LLC since 2015. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Cohen beneficially owned 5,409,906 shares of the Company's common stock, which represented 17.9% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Cohen owned nearly $23.6 million worth of Wrap stock.

44.     For the fiscal year ended December 31, 2019, Defendant Cohen received $120,000 in compensation from the Company for non-director services.

45.     The Company's 2020 Proxy Statement stated the following about Defendant Cohen:

> **Scot Cohen** cofounded the Company with Mr. James Barnes and Mr. Elwood Norris in March 2016, and currently serves as its Executive Chair since July 2017. Prior to that, he served as a Manager until the Company's incorporation in March 2017 at which time he was appointed to serve as the Company's Corporate Secretary until January 2018. Mr. Cohen has over 20 years of experience in institutional asset management, wealth management, and capital markets. He currently manages several operating partnerships that actively invest in the energy sector in addition to maintaining an active investment portfolio in various public companies, early stage private companies, hedge funds and alternative assets including real estate. Some of these include serving as Principal of the Iroquois Capital Opportunity Fund, a closed end private equity fund he founded in 2010 which focuses on investments in North American oil and gas assets;as [sic] the Manager of V3 Capital, LLC, an investor in public and private companies that he also founded in 2015; and was the co-founder of Iroquois Capital Investment Group, LLC. Mr. Cohen currently sits on the board of directors of Charlie's Holding, Inc., and serves as Executive Chair of the Board of Petro River Oil Corp. since 2012. Mr. Cohen earned his Bachelor of Science degree from Ohio University.
>
> The Board believes Mr. Cohen's success with multiple private investment firms, his extensive contacts within the investment community and financial expertise strengthens the Company's efforts to raise capital to fund the continued implementation of its business plan.

### **Defendant Kinsella**

46.     Defendant Kinsella has served as a Company director since November 2018. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Kinsella beneficially owned 56,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Kinsella owned approximately $245,250 worth of Wrap stock.

14

Verified Shareholder Derivative Complaint

47.    For the fiscal year ended December 31, 2019, Defendant Kinsella received $42,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

48.    The Company's 2020 Proxy Statement stated the following about Defendant Kinsella:

> **Patrick Kinsella** was appointed as a director of the Company in November 2018. Mr. Kinsella previously served as an adjunct professor at the USC Marshall School of Business, from August 2011 to December 2019. In 2014, he was appointed as a director and the Chairman of the Audit Committee of PennyMac Financial Services, Inc. ("*PennyMac*"). Prior to his retirement as a senior audit partner in May 2013, Mr. Kinsella spent over 37 years at with KPMG LLP serving clients generally concentrated in the financial services sector, including banks, thrifts, mortgage companies, automotive finance companies, alternative investment companies and real estate companies. Mr. Kinsella received a Bachelor of Science Degree in Accounting from California State University, Northridge, and is a licensed certified public accountant in the State of California.
>
> The Board believes that Mr. Kinsella's extensive experience in providing professional accounting and auditing services and his experience serving as Chair of the Audit Committee of PennyMac is an asset to the Board.

### Defendant Norris

49.    Defendant Norris has served as a Company director since January 2018. Previously, he served as the Company's CEO from December 2018 until July 30, 2020. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Norris beneficially owned 2,336,596 shares of the Company's common stock, which represented 7.6% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Norris owned nearly $10.2 million worth of Wrap stock.

50.    For the fiscal year ended December 31, 2019, Defendant Norris received $798,325 in compensation from the Company, which consisted of $180,000 in salary and $618,325 in stock awards. For the fiscal year ended December 31, 2018, Defendant Norris

received $388,238 in compensation from the Company, which consisted of $120,000 in salary and $268,238 in option awards.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Norris:

> ***David Norris*** was appointed as a director of the Company and the Company's President in January 2018, and was promoted to the Company's Chief Executive Officer in December 2018. Prior to joining the Company, he served in senior executive roles at privately held loanDepot, Inc. from April 2014 to December 2017, during which time it rapidly expanded into the fifth largest mortgage lender in the United States. Most recently, he served as Chief Revenue Officer of loanDepot, with prior executive positions including President and Chief Operating Officer. In October 2012, Mr. Norris was appointed as Chief Executive Officer of Greenlight Financial Services, which was sold to Nationstar Mortgage in May 2013, whereupon he served as President of Direct Lending and Chief Marketing Officer until February 2014. Mr. Norris also previously served as President at LendingTree, Inc. and Discover Home Loans. In addition, Mr. Norris' career includes executive and management roles at Toshiba America Information Systems, Qualcomm Personal Electronics and American Technology Corporation. His early career was as a probation officer in San Diego for five years. Mr. Norris earned his Bachelor of Science degree in business administration from University of Phoenix in 1993.
>
> The Board believes that Mr. Norris' significant executive experience in rapidly growing businesses and a background in developing, launching and manufacturing new products makes him a valued member of the Board.

### Defendant Parris

52.     Defendant Parris has served as a Company director since November 2017. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Parris beneficially owned 248,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Parris owned nearly $1.1 million worth of Wrap stock.

53.     For the fiscal year ended December 31, 2019, Defendant Parris received $42,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

54.     The Company's 2020 Proxy Statement stated the following about Defendant Parris:

> **Michael Parris** was appointed as a director of the Company in November 2017. Mr. Parris has been a partner at Perry Rogers Partners Inc. ("*Perry Rogers*"), a sports management firm, since 1996, where he primarily oversees the SHAQ Brand and other strategic alliances. His role at Perry Rogers encompasses business development, worldwide brand management, marketing and public relations. Prior to joining Perry Rogers, Mr. Parris had a successful career in law enforcement with the Newark Police Department in Newark, New Jersey rising to the rank of Lieutenant. During his career in law enforcement, he worked and commanded several specialized units, including Homicide, Robbery, and Internal Affairs. Mr. Parris holds a Bachelor of Science degree in Business Management from the University of Phoenix.
>
> The Board believes that given his background in law enforcement and worldwide marketing and brand experience, Mr. Parris' broad experience and insights into the market served by the Company enhances the Board and the Company.

### Defendant Walker

55.     Defendant Walker has served as a Company director since November 2018. He also serves as the Chair of the Compensation Committee and Nominating and Governance Committee, and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Walker beneficially owned 26,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2020 was $4.36, Defendant Walker owned nearly $114,450 worth of Wrap stock.

56.     For the fiscal year ended December 31, 2019, Defendant Walker received $42,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

57.    The Company's 2020 Proxy Statement stated the following about Defendant Walker:

> **Wayne Walker** was appointed as a director of the Company in November 2018. Mr. Walker has more than 25 years of experience in corporate law, governance and corporate restructuring, including working 15 years at the DuPont Company in the Securities and Bankruptcy group, where he worked in the Corporate Secretary's office and served as Senior Counsel. In 2003, Mr. Walker founded Walker Nell Partners, Inc. ("*Walker Nell*"), an international business consulting firm providing corporate governance and restructuring, fiduciary services, litigation support, and other services to client corporations and law firms, where he continues to serve as the president. In his role at Walker Nell, he has served on a number of corporate boards including of BridgeStreet Worldwide (global housing provider), Last Call Operating Companies (owner of national restaurants brands Fox & Hound, Champps and Bailey's Bar and Grill) and Seaborne Airlines (a regional carrier in the Caribbean).  Wayne currently serves on the board of the Pitcairn Company, a multi-family office wealth management firm, where he chairs the Compensation Committee. He has also been active on various charitable boards and currently serves as Vice President of Board of Education of the City of Philadelphia. He is the former Chairman of the Board of Trustees of National Philanthropic Trust, a public charity that holds over $11.0 billion of assets under management, and the Board of Directors for Humanity International, a global non-profit, non-governmental housing organization. He holds a Bachelor of Arts Degree from Loyola University New Orleans and a Juris Doctorate from Catholic University of America. He also studied finance for non-financial managers at the University of Chicago's Graduate School of Business.
>
> The Board believes that Mr. Walker's substantial knowledge and more than 25 years of experience in corporate governance, restructuring and corporate litigation enhances the Board's corporate governance and related experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.    By reason of their positions as officers, directors, and/or fiduciaries of Wrap and because of their ability to control the business and corporate affairs of Wrap, the Individual Defendants owed Wrap and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to

control and manage Wrap in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wrap and its shareholders so as to benefit all shareholders equally.

59.     Each director and officer of the Company owes to Wrap and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wrap, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.     To discharge their duties, the officers and directors of Wrap were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wrap, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Wrap's Board at all relevant times.

63.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded

on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

64. To discharge their duties, the officers and directors of Wrap were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Wrap were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Wrap's own Code of Business Ethics and Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Wrap conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Wrap and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Wrap's operations would comply with all applicable laws and Wrap's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.     Each of the Individual Defendants further owed to Wrap and the shareholders the duty of loyalty requiring that each favor Wrap's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Wrap and were at all times acting within the course and scope of such agency.

67.     Because of their advisory, executive, managerial, and directorial positions with Wrap, each of the Individual Defendants had access to adverse, non-public information about the Company.

68.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wrap.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Wrap was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wrap and was at all times acting within the course and scope of such agency.

**WRAP'S CODE OF CONDUCT**

74.   The Company's Code of Conduct states "[t]he Code applies to the members of the Board [], the executive officers (as defined under the regulations of the SEC) of the Company, including, in any case, but not limited to, the Company's principal executive officer, principal financial officer, principal accounting officer or persons performing similar functions [], and all employees of the Company." Further, the Company's Code of Conduct states that "[e]ach director, officer, and employee will be responsible for complying with this Code."

75.   The Company's Code of Conduct also states that it is "intended to deter wrongdoing and promote honest and ethical conduct, including the fair and ethical handling of actual conflicts of interest between personal and professional relationships" and that it is "also designed to avoid conflicts of interest, or the appearance of conflicts…"

76.   The Company's Code of Conduct further provides that it is "also intended to promote full, fair, accurate, timely and understandable disclosure in documents the Company files with, or submits to, the [SEC] and in all other public communications made by the Company."

77.   The Company's Code of Conduct further states that it is "also intended to promote compliance with applicable governmental laws, rules and regulations; prompt internal reporting to designated persons of violations of the Code; and accountability for adherence to the Code."

78.   In a section titled, "Application of Code and Reporting Violations," the Code of Conduct states that "any director, officer or employee should also feel at liberty to report any such alleged prohibited act hereunder to the Chair of the Board or Audit Committee" and that "[a]ll directors, officers and employees are expected to provide full cooperation

and disclosure to the Audit Committee or Board, the Company and its internal and external auditors in connection with any review of compliance with this Code."

79.    In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

> Every director, officer and employee have a duty to avoid any personal activity, investment or association (whether directly or indirectly) that could appear to interfere with good judgement concerning the interests of the Company or that divide such person's loyalty to the Company. No employee, officer or director may exploit his or her position or relationship with the Company for personal gain. All employees, officers and directors should avoid even the appearance of such a conflict.

80.    In a section titled, "Conduct of Business, Fair Dealing and Fair Competition and Anti-Trust Laws," the Code of Conduct states the following:

> No director, officer or employee may:

* * *

> • Profit, or assist others to profit, from confidential information or business opportunities that are available because of services to the Company[.]

81.    In a section titled, "Compliance with Laws and Regulations," the Code of Conduct states the following:

> It is the policy of the Company to comply with the laws of each country in which the Company conducts business. Each director, officer and employee must comply with all applicable laws, rules and regulations, and should use all reasonable efforts to oversee compliance by other directors, officers and employees with all applicable laws, rules and regulations.

* * *

> Each such director, officer and employee must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the

Company's outside legal counsel on specific Company policies and procedures. Violations of laws, regulations, rules, and orders may subject a director, officer or employee to individual criminal or civil liability, as well as to discipline by the Company. Such individual violations may also subject the Company to civil or criminal liability or the loss of business.

82.    In a section titled, "Use of Material and Insider or Confidential Information," the Code of Conduct states the following:

Confidential information includes all non-public information that might be of use to competitors or harmful to the Company or its customers, clients and vendors if disclosed. Confidential information, in any form, obtained through business or personal contacts with customers, prospective customers, vendors, suppliers, or other employees must be used solely for the Company's purposes. Information reflecting favorably or adversely upon the current or future value of any business enterprise should not be used in any manner for personal gain or for advantage to a third party.

83.    In a section titled, "Additional Policies for Senior Financial Officers," the Code of Conduct defines "Senior Financial Officers" as the "[CEO], [CFO], Corporate Controller, Director of SEC Reporting and others performing similar functions" and states the following:

- All Senior Financial Officers are responsible for full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company. Accordingly, it is the responsibility of the CEO and each Senior Financial Officer to promptly to [sic] bring to the attention of the Company's outside legal counsel or the CEO any material information of which he or she may become aware of that affects the disclosures made by the Company in its public filings.

- Further, each Senior Financial Officer must promptly bring to the attention of the Company's outside legal counsel or Chair of the Audit Committee any information he or she may have concerning:

- o significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or,

- o any fraud, whether or not material, that involves management or other employees who have significant role in the Company's financial reporting, disclosures or internal controls.

- The CEO and each Senior Financial Officer must act with honesty and integrity in the performance of his or her duties at the Company, must comply with laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the conduct of the Company's business and the Company's financial reporting.

84.     The Individual Defendants violated Wrap's Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and failing to report the same. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

85.     Founded in March 2016 and incorporated in Delaware in March 2017, Wrap is an Arizona-based security technology company. Wrap touts itself as focused on delivering modern policing solutions to customers, primarily consisting of law enforcement and security personnel. The Company's flagship product offering is the BolaWrap—a hand-held remote restraint device that discharges an eight-foot bola style Kevlar tether at approximately 513 feet per second to entangle a subject at a range of 10-25 feet. Wrap markets the product as "remote handcuffs" that "safely" and "humanely" restrain resisting subjects from a distance "without relying on pain compliance tools."

86.     Defendants Barnes, and Cohen, together with E. Norris, the Company's CTO, co-founded the Company on March 2, 2016. Initially, the Company was organized as a Delaware limited liability company with its headquarters and its main manufacturing facility both located in Las Vegas, Nevada. By the end of that year, in December 2016, the Company demonstrated Wrap's first prototype of the BolaWrap device.

87.      Thereafter, on March 22, 2017, the Company merged with and into a wholly-owned subsidiary MegaWest Energy Montana Corp. ("MegaWest") of Petro River Oil Corp., a company that had been significantly owned by Defendant Cohen, at which time MegaWest had changed its name to Wrap.

88.     In April 2017, the Company developed pre-manufacturing demonstration prototypes of BolaWrap. Several months later, Wrap assembled the Company's first production units and commenced demonstrations and trial deployments of the BolaWrap with a small number of law enforcement agencies beginning in November 2017.

89.     The following year, 2018, the Company delivered approximately 200 BolaWrap devices to selected law enforcement agencies at no cost for the purposes of evaluation and feedback. Based on that feedback, in October 2018, the Company demonstrated Wrap's new green line laser accessory which was designed to allow the user of the device to accurately deploy the BolaWrap during both daytime and nighttime.

90.     To ramp up manufacturing capacity, the Company relocated its manufacturing operations to a new facility in Tempe, Arizona and commenced production in September 2019.

91.     On December 3, 2019, the Company confirmed a report published in the *Los Angeles Times* that announced the LAPD's decision to engage in the LAPD BolaWrap Pilot Program. According to Deputy Chief Martin Baeza, Head of the Personnel and Training Bureau of the LAPD, the purpose of the LAPD BolaWrap Pilot Program was to determine if the BolaWrap would meet the LAPD's "needs and standards." The article also cited to Fort Worth, Texas Police Department SWAT Officer, Donald McCreery, the first officer

in the country that had utilized the BolaWrap in the field,[3] stating that, in order to successfully deploy the device, it "has to fit the situation."

92.     On January 8, 2020, Michael R. Moore, the LAPD's Chief of Police, circulated an intradepartmental memorandum (the "LAPD BolaWrap Pilot Program Guidelines") that detailed the department's guidelines for the LAPD BolaWrap Pilot Program. The LAPD BolaWrap Pilot Program Guidelines informed that "officers shall exercise de-escalation techniques to resolve potential use of force incidents" "whenever practicable[.]" Further, the LAPD BolaWrap Pilot Program Guidelines provided specific circumstances that must be present for the BolaWrap to be deployed in the field. The LAPD BolaWrap Pilot Program Guidelines stated, in relevant part, the following:

> Officers may deploy the BolaWrap when the circumstances perceived by the officer indicate that:
>
> a.  An individual needing to be detained or controlled indicates through words or action that he or she will resist arrest, or will not voluntarily comply with lawful orders; or,
> b.  The individual has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, himself/herself or others.

93.     Regarding reporting the use of the BolaWrap, the LAPD BolaWrap Pilot Program Guidelines provides that "officers shall report any use of the BolaWrap during a tactical incident[.]"

94.     On February 5, 2020, the LAPD Board of Commissioners authorized the start of the LAPD BolaWrap Pilot Program. Although the LAPD BolaWrap Pilot Program was initially meant to only last 90 days, the LAPD Board of Commissioners authorized the extension of the initial term of the LAPD BolaWrap Pilot Program to 180 days.

95.     Then, at a hearing held on August 25, 2020, the LAPD Board of Commissioners reviewed and approved the LAPD Chief of Police's request to extend the

---

[3] Officer McCreedy deployed the BolaWrap in April 2019.

LAPD BolaWrap Pilot Program for an additional 180 days to continue to evaluate the BolaWrap for effectiveness.

**False and Misleading Statements**

***April 29, 2020 Form 10-Q & Earnings Call***

96.     On April 29, 2020, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Barnes, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Norris and Barnes attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

97.     The 1Q20 10-Q stated the following regarding internal controls:

There have been no changes in our internal control over financial reporting during our fiscal quarter ended March 31, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Our process for evaluating controls and procedures is continuous and encompasses constant improvement of the design and effectiveness of established controls and procedures and the remediation of any deficiencies, which may be identified during this process.

98.     The 1Q20 10-Q stated the following regarding disclosure controls:

Under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, as of March 31, 2020 we conducted an evaluation of our disclosure controls and procedures as such term is defined under Rules 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. ***Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

99.     Also on April 29, 2020, the Company issued a press release in connection to Wrap's first fiscal quarter 2020 financial results. The press release emphasized the following, in relevant part:

**First Quarter and Recent Operational Highlights**:[4]

- In February, began field testing BolaWrap with hundreds of officers in the Los Angeles Police Department (LAPD), the third largest police department in the U.S. with more than 9,000 sworn officers
- Received new orders for BolaWraps from police agencies in California, Missouri, Illinois, Virginia, Louisiana, Maryland, Minnesota, and Washington during March 2020
- Shipped international purchase orders for 200 BolaWraps and 2,000 cartridges and accessories
- Q1 international shipments raise the total countries receiving BolaWrap products to 19

100.    Also on April 29, 2020, Wrap held a conference call in connection to the Company's financial results for the fiscal quarter ended March 31, 2020. During the call, Defendant Smith stated:

As many of you are aware, LAPD began field testing the BolaWrap in February of this year. 200 BolaWraps have been circulating among approximately 1,100 trained officers throughout L.A. City. As of today, they are a little over two-thirds of the way through their original 90-day trial period, however given what the complications the department has faced from the coronavirus, we expect that they will likely extend the field trial and we will be more than happy to continue to support the department.

101.    Also during the call, in the same way, Defendant Rothans represented that:

Many agencies across the U.S. are only responding to emergency calls and not routine calls, which means as supposedly being proactive and maybe encountering somebody self initiated activities for somebody that's suffering from mental health crisis, somebody under the influence, now they're encouraged to stay away from that individual. So, that does limit the use and

---

[4] Emphasis in original.

we've actually seen that even in LAPD's trial, but this of course is a limited period of time.

**Truth Begins to Emerge as False and Misleading Statements Continue**

102.    On July 22, 2020, *Seeking Alpha* published the First White Diamond Report titled "Wrap Technologies: Batman Device Is Mostly Impractical In The Real World - $3 Price Target." The First White Diamond Report asserted that the BolaWrap is an "impractical device" with a very limited market. Specifically, the First White Diamond Report stated the following, in relevant part:

> [T]he BolaWrap is an impractical device with a limited use-case for law enforcement. As the tether extends 8 feet when fired, it requires at least 4 feet on either side of the target to extend properly, and a minimum of 10 feet of further separation between the officer and the target.
>
> * * *
>
> We've spoken with many police officers asking if they would ever use the BolaWrap. Many have told us that using this device would be in such rare situations, that it would be hard to use.
>
> The only plausible application of the device appears to be during street stops. Which are when a police officer stops a citizen on the street to ask questions or ask to conduct a search. According to the US Department of Justice . . . only ~1.0% of police to public contact takes place during street stops. Even more extreme, is that only 4.1% . . . of the altercations typically lead to an arrest. And this is further narrowed by the subsegment already being served by many other devices.
>
> * * *
>
> BolaWrap's TAM (Total Addressable Market) is very small. Lots of space is needed to successfully execute the device. . . . Most importantly, the device is only being marketed for the use on the mentally ill . . . .
>
> The combination of both a limited target market and the device's impracticality in most environments points to a significant limitation for the TAM. With most mental health episodes taking place domestically, police department demand and resulting sales are likely to remain constrained.

103.   Further, the First White Diamond Report claimed that Wrap had likely failed to secure an agreement with the LAPD.

> The Los Angeles Police Department ("LAPD") started a 90 day field trial with the BolaWrap in February of this year. At the time, this was a big deal, and was parroted a lot in the media in December/January right before the field trial. However, after January, the BolaWrap hasn't been the media with respect to the LAPD.
>
> * * *
>
> At this point, it has been three months since WRTC's earnings call where Smith said the LAPD field trial is two-thirds finished. If the LAPD really felt a strong need for it, we believe the deal would have been announced by now. Since it hasn't been announced, then the clear implication is that it appears that LAPD decided not to make the purchase, or at least one that matters.

104.   On this news, the price of the Company's stock dropped from $11.89 per share at the close of trading on July 21, 2020, to an intra-day low of $10.62 per share, representing a drop of nearly 10.7%, before settling at $11.34 per share at the close of trading on July 22, 2020, a drop of more than 4.6%, on heavy trading volume.

### *July 30, 2020 Earnings Call*

105.   On July 30, 2020, Wrap held a conference call in connection to the Company's financial results for the fiscal quarter ended June 30, 2020. During the call, Defendant Norris stated that the "LAPD trained about 1,100 officers and they do have 200 devices in the field 24 hours a day with those 1,100 officers."

106.   Also on the call, Defendant Smith commented on the LAPD's BolaWrap trial, stating:

> There is one large department within the U.S. that we've been undergoing trials with and that is the Los Angeles Police Department.

When this program first started, we initially thought that the trial period would last approximately 90 days. However, with optional extensions – periods built in the agreement, some of which have already been exercised. There was the potential for this trial to last for upwards of one year. Bear in mind, those terms were discussed before the Coronavirus began to impact the U.S. in earnest and therefore, they are subject to change.

*The current extension is set to end in August, but it is possible and most likely we will see another extension exercised. I am fully aware that humans are risk adverse beings. And so, there is a natural tendency to fill the void left by uncertainty with negative speculations. So, let me try to put some of those at ease. Extensions are a very good thing.*

*If LAPD didn't like the product, they wouldn't be asking for extensions, and we have continued to receive positive feedback from them.*

To conduct this trial, LAPD had to train 1,100 officers on the BolaWrap. They committed approximately 8,800 hours to training which is equivalent to four man years that's a massive investment on their part. The opportunity cost of pulling that many officers out of rotation and into training should not be discounted. They've committed substantial resources towards this project.

*So rest assured they are spending the time that they believe is adequate to give the BolaWrap an honest and thorough evaluation. Regardless of how this trial ultimately goes, it's clear from the domestic and international reception so far that the BolaWrap is gaining traction.*

(Emphasis added.)

107. The statements in ¶¶ 96–101 and 105–106 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the BolaWrap could only be deployed under a particularly narrow set of logistical circumstances due to its design; (2) consequently, it was not likely that the BolaWrap would be operational and/or consistently deployed successfully in the field; (3) Wrap had suppressed the results of the LAPD BolaWrap Pilot Program, which revealed that the BolaWrap was largely ineffective, too costly, hardly employed by officers in the field, and that the LAPD merely extended the program due to an insufficient sample

size of BolaWrap deployments to properly evaluate the effectiveness of the device; (4) as a result of the LAPD's findings, the LAPD and/or other comparable police departments were unlikely to agree to purchase a significant amount of BolaWrap units and therefore it was doubtful that Wrap would derive substantial revenue from the LAPD and/or other comparable police departments; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *July 31, 2020 Form 10-Q*

108.   On July 31, 2020, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Barnes, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Norris and Barnes attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109.   The 2Q20 10-Q stated the following regarding internal controls:

There have been no changes in our internal control over financial reporting during our fiscal quarter ended June 30, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Our process for evaluating controls and procedures is continuous and encompasses constant improvement of the design and effectiveness of established controls and procedures and the remediation of any deficiencies, which may be identified during this process.

110.   The 2Q20 10-Q stated the following regarding disclosure controls:

Under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, as of June 30, 2020 we conducted an evaluation of our disclosure controls and procedures as such term is defined under Rules 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. ***Based***

*on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level.*

(Emphasis added.)

### August 25, 2020 Los Angeles Times Article

111.   After the market closed on August 25, 2020, the *Los Angeles Times* published an article titled "LAPD will keep testing BolaWrap, a device meant to immobilize suspects from a distance," which reported that the LAPD extended the LAPD BolaWrap Pilot Program to continue evaluating the device. The article stated, in relevant part:

Los Angeles police will continue testing a tether restraint designed to help immobilize suspects from a distance — known as the BolaWrap — after an initial six-month pilot program produced too little data to gauge the tool's overall effectiveness.

At the department's request, the Police Commission unanimously granted a 180-day extension to the program during its meeting Tuesday morning.

Since the initial 180-day pilot began in February, LAPD officers have used the BolaWrap a total of nine times. It was deemed "effective" in six instances.

According to an LAPD report on those incidents provided to the commission, successful deployments helped take various suspects into custody, including a naked man running through traffic, a suspect wielding a pipe, a suspect with a knife, and an arson suspect.

The devices were ineffective in one incident in which a suspect was up against a fence, in another where a suspect wore a very a large, bulky coat, and another in which the officer who fired the tether missed the suspect, the report said.

Deputy Chief Martin Baeza told the commission that the department hoped to gather data from more deployments in the coming months to help determine whether to keep using the BolaWrap.

He said the devices were meant to assist officers in bringing potentially dangerous situations to an end without using more deadly force, and that he remained optimistic they could serve that purpose.

Baeza said the LAPD was also working with the manufacturer of the BolaWrap, which provided 200 devices for testing, to see if improvements might be made to make the devices more effective.

112.   On this news, the price of the Company's stock dropped from $8.77 per share at the close of trading on August 25, 2020, to $8.27 per share at the close of trading on August 27, 2020, a drop of more than 5.7%, on heavy trading volume over the two trading days.

### *September 3, 2020 LD 500 Virtual Conference*

113.   On September 3, 2020, on behalf of the Company, Defendant Smith gave a presentation at the LD 500 Virtual Conference, during which he failed to mention the results of the LAPD BolaWrap Pilot Program and, instead, represented, in relevant part:

We're used in over 210 agencies around the United States, the largest being so far the Los Angeles Police Department, or LAPD. They've trained 1,100 officers and have over 200 devices out on the street. ***They are about halfway through their field trial, they'll be wrapping that up in early February of next year. And so far they've had great feedback from the officers and their uses so far***.

(Emphasis added.)

114.   At the LD 500 Virtual Conference, in response to a question about the annual cartridge usage per unit in the field, Defendant Smith stated:

It's really hard to say at this point because we're getting very skewed data from the number of trainings that we have, and the number of cartridges that are being ordered.

115.   Also at the LD 500 Conference, in reply to a question regarding the tracking of "how often police departments use it," Defendant Smith answered, "[w]e're working with agencies to try and get that info. But a lot of times they're not tracking this info so it's a bit more difficult for us."

116.   Less than a week later, on September 9, 2020, on behalf of the Company, Defendant Smith gave a presentation at the 9th Annual Gateway Conference. During his presentation, Defendant Smith reiterated his portrayal of the LAPD's feedback on the BolaWrap, failed to mention the results of the LAPD BolaWrap Pilot Program, and again stated, in relevant part:

> We're used in over 210 agencies around the United States, the largest being so far the Los Angeles Police Department, or LAPD. They've trained 1,100 officers and have over 200 devices out on the street. ***They are about halfway through their field trial, they'll be wrapping that up in early February of next year. And so far they've had great feedback from the officers and their uses so far***.

(Emphasis added.)

117.   The statements in ¶¶ 108–110 and 113–116 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the BolaWrap could only be deployed under a particularly narrow set of logistical circumstances due to its design; (2) consequently, it was not likely that the BolaWrap would be operational and/or consistently deployed successfully in the field; (3) Wrap had suppressed the results of the LAPD BolaWrap Pilot Program, which revealed that the BolaWrap was largely ineffective, too costly, hardly employed by officers in the field, and that the LAPD merely extended the program due to an insufficient sample size of BolaWrap deployments to properly evaluate the effectiveness of the device; (4) as a result of the LAPD's findings, the LAPD and/or other comparable police departments were unlikely to agree to purchase a significant amount of BolaWrap units and therefore it was doubtful that Wrap would derive substantial revenue from the LAPD and/or other comparable police departments; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable

basis at all relevant times. As a result of the foregoing, Wrap's public statements were materially false and misleading at all relevant times.

### **The Full Truth Emerges**

118.   On September 23, 2020, *Seeking Alpha* published the Second White Diamond Report titled "Wrap Technologies: Disastrous LAPD BolaWrap Pilot Program Results, No Evidence These Have Been Communicated to Investors." The Second White Diamond Report revealed a "key milestone failure" from an LAPD report, dated August 25, 2020, that was filed after the LAPD BolaWrap Pilot Program's initial six-month term expired and it alleged that the Company had concealed the "disastrous" report from investors. Specifically, the Second White Diamond Report stated the following, in relevant part:

> ***The LAPD BolaWrap Pilot Program Results Have Been Revealed –***
> ***And It Is Ugly***
>
> The LAPD and the respective BolaWrap trials have been a common theme in WRTC presentations since December 2019. The company's management has seemingly failed to disclose, however, a key milestone failure from an LAPD report filed after the six-month trial program finished on 8/25/20. We found this report through our continued research on the company. There isn't any evidence that company executives have referenced or mentioned the LAPD report. This is the only comprehensive in-field study that has been done on the BolaWrap. So why haven't the results been released to investors? It's bad news.
>
> Over a six-month period, 200 BolaWrap devices in the hands of 1,100 LAPD officers in the field were only used nine times, and only worked once. On an annualized basis, this comes to each BolaWrap is only used 0.09 times per year. Or, once every 11 years. At least 191 BolaWraps weren't used at all in the pilot program, they were just sitting there collecting dust. We believe this was about the worst result that could've happened from the program. The only way it could've been worse, is if the BolaWrap didn't work at all.
>
> This was an important pilot program, that will be looked at by potential large police departments. The following statements by WRTC management illustrate how much time, expense, and training was put into the LAPD pilot program.

* * *

### *An Analysis Of The LAPD BolaWrap Pilot Trial Results*

The LAPD BolaWrap pilot program results can be found here. It's dated 8/25/20 from the Chief of Police to the Board of Police Commissioners. The program reviewed was from 2/5/20 until 8/10/20. It states:

the BolaWrap has been utilized nine times. Due to an insufficient sample size, an additional 180 days is needed in order to evaluate the effectiveness of the device.

The nine incidents of utilization are described in the report. It says that the number of incidents where the device was effective was six times. But looking at it closely, the BolaWrap did what it's supposed to do, as shown in the WRTC demonstration videos, only once.

Analyzing each of the incidents:

1. A naked man was running in and out of traffic. The BolaWrap was deployed, it hit him in the legs but didn't wrap. This made the suspect take a fighting stance. An officer deployed his baton on the suspect, and he was taken into custody without further incident. This incident is marked as "effective" but it really wasn't. It didn't wrap around and disable the suspect but in fact made him more hostile as he took a fighting stance. The officer had to use force with his baton, which could've been used without the BolaWrap and likely end up with the same result.

2. A call came in to report a male with a mental illness. The BolaWrap wrapped around the suspect but he was wearing a "puffy jacket" and he immediately pulled his arms free. This incident was marked "ineffective".

3. A call came in to report an ADW (Assault with a Deadly Weapon) suspect. Officers observed the suspect with a pipe in his hands. The officers told the suspect to drop it, but he wouldn't comply. First, the 40mm Less-Lethal Launcher was used to strike the suspect but had no effect. Then the BolaWrap was deployed at the suspect's legs. It didn't wrap around his legs, but the suspect immediately complied afterwards. This incident was marked "effective" because no additional force was needed after the

BolaWrap was deployed. But again, it wasn't really effective because it didn't do what it's supposed to do, which is wrap around a suspect.

4. A call came in to report an ADW suspect with a knife. The suspect failed to comply with officers' commands. The BolaWrap was deployed at the suspect's legs and successfully wrapped around him, stopping his advancement. This was the only time out of these nine utilizations that the BolaWrap successfully "wrapped" a suspect.

5. Officers were in pursuit of a suspect. The BolaWrap was shot at the suspect's legs. Again, it didn't wrap around the suspect's legs, but it startled the suspect and he was taken into custody. This was marked "effective", but in our opinion it wasn't. Again, the BolaWrap didn't work like it's supposed to - it didn't wrap.

A man was disturbing the peace. The BolaWrap was deployed at the suspect's legs. It hit the suspect's legs but didn't wrap around it completely, and he stepped out of the tether. The officers then utilized a team takedown to take the suspect into custody. This was marked "effective" as it stopped the suspect from walking away. This is more effective than the other times, because he had to actually step out of the tether, which slowed him down. But still, it didn't wrap completely around his legs.

6. A call came in of an arson suspect. The BolaWrap was deployed at the suspect's legs, it hit him in the knee but didn't wrap. He was stunned by the impact, and was taken into custody without further incident. Because there wasn't further incident, it was marked effective, but in reality it was another fail.

7. A call came in of a family dispute. The suspect was armed with a large stick. The BolaWrap was shot at his arms, but didn't wrap, possibly because it hit a fence behind the suspect. The officers then utilized a 40mm Less Lethal Launcher and the suspect was taken into custody. This was marked as ineffective because it didn't wrap and another tool was necessary to take the suspect into custody.

8. A suspect refused to comply with officers' orders and the BolaWrap was deployed. It missed the suspect. Therefore, it was deemed ineffective.

Verified Shareholder Derivative Complaint

119.   On this news, the price of the Company's stock dropped from $8.14 per share at the close of trading on September 22, 2020, to an intra-day low of $5.68 per share, representing a drop of more than 30.2%, before settling at $6.07 per share at the close of trading on September 23, 2020, a drop of approximately 25.43%, on uncommonly heavy trading volume. This final drop represents a staggering 57.8% decrease from a Relevant Period high of $14.40 per share on July 17, 2020.

120.   On September 23, 2020, The Motley Fool published an article titled "Why Wrap Technologies Shares Plunged 30.1% Today," which explained that the data revealed in the Second White Diamond Report was "hardly impressive for a company that generated just $833,000 of revenue in the second quarter of 2020" and that "[a] net loss of $2.8 million in the quarter means the company has a long way to go to be profitable, and data like we saw from the LAPD is hardly inspiring."

## **DAMAGES TO WRAP**

121.   As a direct and proximate result of the Individual Defendants' conduct, Wrap has lost and expended, and will lose and expend, many millions of dollars.

122.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its former and current CEO, its President, its COO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

124.   As a direct and proximate result of the Individual Defendants' conduct, Wrap has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and

their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

125. Plaintiff brings this action derivatively and for the benefit of Wrap to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Wrap, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

126. Wrap is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127. Plaintiff is, and has continuously been at all relevant times, a shareholder of Wrap. Plaintiff will adequately and fairly represent the interests of Wrap in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

128. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

129. A pre-suit demand on the Board of Wrap is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Cohen, Kinsella, Norris, Parris, and Walker (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

130. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of the Individual Defendants engaged in insider sales based on material non-public information, netting proceeds of approximately $258,588, which renders the Directors unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

131.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

132.   Additional reasons that demand on Defendant Cohen is futile follow. Defendant Cohen is the co-founder of the Company and has served as the Company's Executive Chair since July 2017. Thus, he is a non-independent director. Defendant Cohen has received and continues to receive handsome compensation for non-director services, including $120,000 during fiscal year 2019. Additionally, Defendant Cohen founded, owns, controls, and serves as the Managing Partner of V3 Capital Partners, LLC, which the Company has engaged to provide certain investor, shareholder, and marketing services and had also engaged to provide assistance in a qualified financing.[5] As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

---

[5] Since April 2020, the Company has paid $10,000 per month to V3 Capital Partners, LLC in connection to investor, shareholder, and marketing services. Further, in July 2020, the Company paid V3 Capital Partners, LLC a bonus in the amount of $175,000 in connection to its work on the qualified financing that was completed in June 2010.

133.   Additional reasons that demand on Defendant Kinsella is futile follow. Defendant Kinsella serves as a Company director since November 2018. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Kinsella has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kinsella breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Additional reasons that demand on Defendant Norris is futile follow. Defendant Norris has served as a Company director since January 2018. Previously, he served as the Company's CEO from December 2018 until July 30, 2020. Defendant Norris has received and continues to receive handsome compensation, including at least $798,325 in 2019, for his services. Thus, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Norris also personally made the false and misleading statements during the July 30, 2020 earnings call. Also, Defendant Norris signed, and thus personally made the false and misleading statements in the SOX certifications. Moreover, Defendant Norris is a defendant in the Securities Class Actions. For these reasons too, Defendant Norris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.   Additional reasons that demand on Defendant Parris is futile follow. Defendant Parris has served as a Company director since November 2017. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee. Defendant Parris has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Parris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.   Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since November 2018. He also serves as the Chair of the Compensation Committee and Nominating and Governance Committee, and as a member of the Audit Committee. Defendant Walker has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.   Additional reasons that demand on the Board is futile follow.

138.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Cohen co-founded the Company together with Defendant Barnes and Defendant

Norris' father, E. Norris, the Company's CTO. Moreover, three of the five Directors have served on the Board for approximately three years or more. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

139.   Defendants Kinsella, Parris, and Walker (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

140.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

141.   Wrap has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Wrap any part of the damages Wrap suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

Verified Shareholder Derivative Complaint

142.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

143.   The acts complained of herein constitute violations of fiduciary duties owed by Wrap's officers and directors, and these acts are incapable of ratification.

144.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Wrap. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Wrap, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

145.   If there is no directors' and officers' liability insurance, then the Directors will not cause Wrap to sue the Individual Defendants named herein, since, if they did, they

would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

146.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

147.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wrap's business and affairs.

149.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

150.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wrap.

151.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

152.   In further breach of their fiduciary duties owed to Wrap, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the BolaWrap could only be deployed under a particularly narrow set of logistical circumstances due to its design; (2) consequently, it was not likely that the BolaWrap would be operational and/or consistently deployed successfully in the field; (3) Wrap had

suppressed the results of the LAPD BolaWrap Pilot Program, which revealed that the BolaWrap was largely ineffective, too costly, hardly employed by officers in the field, and that the LAPD merely extended the program due to an insufficient sample size of BolaWrap deployments to properly evaluate the effectiveness of the device; (4) as a result of the LAPD's findings, the LAPD and/or other comparable police departments were unlikely to agree to purchase a significant amount of BolaWrap units and therefore it was doubtful that Wrap would derive substantial revenue from the LAPD and/or other comparable police departments; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, Wrap's public statements were materially false and misleading at all relevant times.

153.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

154.   In breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

155.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

156.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

157.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

158.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wrap has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

159.   Plaintiff on behalf of Wrap has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

160.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Wrap.

162.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied

to the false and misleading statements, or received bonuses, stock options, or similar compensation from Wrap that was tied to the performance or artificially inflated valuation of Wrap, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

163.   Plaintiff, as a shareholder and representative of Wrap, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

164.   Plaintiff on behalf of Wrap has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

165.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

167.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

168.   Plaintiff on behalf of Wrap has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants Barnes, Norris, Rothans, Smith, and Thomas for Contribution Under Sections 10(b) and 21D of the Exchange Act

169.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   Wrap, along with Defendants Barnes, Norris, and Smith who are named as defendants in the Securities Class Actions and Defendants Rothans and Thomas who are named as defendants in one of the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Barnes', Norris', Rothans' Smith's and Thomas' willful and/or reckless violations of their obligations as officers and/or directors of Wrap.

171.   Defendants Barnes, Norris, Rothans, Smith, and Thomas, because of their positions of control and authority as officers and/or directors of Wrap, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Wrap, including the wrongful acts complained of herein and in the Securities Class Actions.

172.   Accordingly, Defendants Barnes, Norris, Rothans, Smith, and Thomas are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

173.   As such, Wrap is entitled to receive all appropriate contribution or indemnification from Defendants Barnes, Norris, Rothans, Smith, and Thomas.

///

///

///

///

///

///

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Wrap, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wrap;

(c)     Determining and awarding to Wrap the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Wrap and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wrap and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
>
> 2. a provision to permit the shareholders of Wrap to nominate at least three candidates for election to the Board; and
>
> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Wrap restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

53

Verified Shareholder Derivative Complaint

reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 13, 2020        Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

_____/sRobert C. Moest_____.
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I,   Naresh Rammohan am   a   plaintiff in   the   within   action. I have reviewed   the   allegations   made   in   this   verified consolidated shareholder derivative   complaint,   know the contents thereof,   and   authorize its   filing. To   those allegations   of   which   I   have personal knowledge,   I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

11/12/2020

DocuSigned by:

*Naresh Rammohan*

73CC66DD95584E2...

Naresh Rammohan